■ MARSHALL BLOOMFIELD, Appellant, v BARBARA BLOOMFIELD, Respondent. [723 NYS2d 143] —Order, Supreme Court,

Bronx County (Judith Gische, J.), entered on or about November 5, 1999, which held unenforceable the parties' prenuptial agreement and directed plaintiff to pay $40,000 in counsel fees, $5,000 in accountant fees, and $20,000 in appraisal fees, affirmed, without costs.

Marshall and Barbara Bloomfield separated in January 1995, after 25 years of marriage. Two of their three children had reached majority; the youngest was 20 years of age. Marshall initiated divorce proceedings in August 1995. Barbara answered and counterclaimed, demanding, *inter alia*, equitable distribution. Discovery proceeded. In September 1997, a preliminary conference order was issued indicating that equitable distribution issues were outstanding and unresolved, and that Marshall intended to rely on a prenuptial agreement as a defense.

At the time they were married, Marshall was about 30 years old, a practicing attorney, and the son of a practicing attorney who was involved in real estate and owned various properties and who placed real estate properties in Marshall's name. Barbara was 24 and had finished one year of college. Before the wedding in May 1969, Marshall asked Barbara to sign a document in which she waived certain property and elective rights. Barbara claims they were alone in her apartment; Marshall claims they were at his father's office with a notary present. In any event, Barbara was not represented by counsel in the negotiating, drafting or signing of the document, and she signed it.

The document reads, in toto:

"I, BARBARA FRIEDLANDER, in order to induce MARSHALL E. BLOOMFIELD, to marry me, and for the consideration of a Lady's Wedding Ring, the receipt of which is hereby acknowledged, (which I have had appraised by Marcus & Co., Inc., located in Gimbel Bros., 33rd Street in New York City, Invoice No. 69630) appraised at the value of one-thousand and six-hundred dollars ($1,600.00), and for the consideration of Marshall's promise to maintain a life insurance policy on his life payable to me upon his death (should he die before me) in the amount of ten-thousand dollars ($10,000), and for other good and valuable consideration, do hereby WAIVE AND RENOUNCE ANY AND ALL RIGHTS that, and to which, I would otherwise be entitled to because of such marriage, whether present or future rights, to any and all property which Marshall has now, or which he may acquire in the future, whether the same be real, personal, [or] mixed property, or of any kind or nature and wherever situated, and I do further expressly WAIVE THE RIGHT OF ELECTION

to take, or to make any demand for, contrary to the provisions of Marshall's last will and testament, pursuant to the provisions of § 5-1.1 of the Estates, Powers and Trusts Law of the State of New York, as said section now exists or may hereafter be amended.

"I understand the meaning of the above, and I make each and every statement contained in this agreement of my own free will and accord. Copy received."

The initial provision of the agreement, which is a completely separate and discrete proviso, states: "I * * * do hereby WAIVE AND RENOUNCE ANY AND ALL RIGHTS that, and to which, I would otherwise be entitled to because of such marriage, whether present or future rights, to any and all property which Marshall has now, or which he may acquire in the future, whether the same be real, personal, [or] mixed property, or of any kind or nature and wherever situated." Significantly, this is followed by a separate and discrete provision that states: "And I do *further* expressly WAIVE THE RIGHT OF ELECTION to take, or to make any demand for, contrary to the provisions of Marshall's last will and testament." (Emphasis added.)

Since in 1969, when the agreement was executed, a wife had no rights in or to her husband's property apart from the right to support, or alimony, the only right that could possibly have been referred to in this waiver was Barbara's right to support upon termination of the marriage. It is basic contract law that every provision of an agreement must be given effect (*Muzak Corp. v Hotel Taft Corp.*, 1 NY2d 42). At the time the agreement was entered into, however, the General Obligations Law prohibited a wife from waiving her right to support (§ 5-311 [L1963, ch 576, as amended by L 1966, ch 254, § 12]), and an agreement that sought to do so was void (*see, Slocum v Slocum*, 42 AD2d 56). Thus, the agreement here is void on this ground alone, as Supreme Court (Judith Gische, J.) correctly held.

Marshall construes the first provision in the agreement, which he acknowledges was a "waiver of non-existent distribution rights," as being "merely prophylactic" and not waiving "any current property rights, but only the right to receive a distribution if there were any subsequent changes in the law." This was prescient indeed on his part, in hindsight, since some 11 years later the Legislature enacted the Equitable Distribution Law, which reformed the guidelines for distribution of property upon the dissolution of a marriage in accordance with the principles of economic partnership rather than outmoded gender-based distinctions (Domestic Relations Law § 236 [B]).

However, in 1969, a wife's waiver of "any and all rights that, and to which, I would otherwise be entitled to because of such marriage, whether present or future rights," necessarily encompassed her right to alimony. The agreement must be read in the context of the economic disparities that generally prevailed between husbands and wives at the time the agreement was entered into and the import of the law in response thereto as it existed at the time it was signed by Barbara in 1969. Indeed, the parties here presented just such an example. It is clear, therefore, that at that time, the only meaning that could be attributed to the first provision is that it purports impermissibly to relieve Marshall of his obligation to support Barbara and it is therefore void on its face.

The dissent's reliance on *Roos v Roos* (206 AD2d 293) is misplaced. In that case, the agreement between the parties made specific dispositions of the parties' respective substantial property rights and, most significantly, included an express provision for an agreed upon amount of support to the wife (*id.* at 295, and trial court's decision of Oct. 26, 1993, index No. 4689/91). The instant agreement, of course, contains no comparable proviso and the first of its two provisions can only be construed as a waiver of support.

Supreme Court correctly rejected Marshall's argument that Barbara is time-barred from challenging the 1969 agreement, because the Statute of Limitations is no defense to her claim that the agreement was void and of no effect at its inception (*Pacchiana v Pacchiana*, 94 AD2d 721, *appeal dismissed* 60 NY2d 586).

The Statute of Limitations does not apply in the case of an agreement void on its face (*Clermont v Clermont*, 198 AD2d 631, *lv dismissed* 83 NY2d 953), as is here the case. Even were it to be concluded that the agreement was voidable, at the very least we would find that the Statute of Limitations for a challenge to a prenuptial agreement is tolled during the marriage. In *Lieberman v Lieberman* (154 Misc 2d 749), it was cogently held that, in view of the public policy of this State with respect to the marital relationship, the statute must be tolled until the parties physically separate, until an action for divorce or separation is commenced, or until the death of one of the parties. The result otherwise is the "anomalous" requirement that, irrespective of the viability of the marriage relationship, the husband and wife must assume adversarial positions as to their prenuptial agreement within the first six years of their marriage or forever lose their right to challenge the agreement (*id.* at 753-754). Such a requirement "flies in the face of logic

and would be against public policy" since it "would critically undermine \* \* \* the vitality of marriages generally" (*Zuch v Zuch*, 117 AD2d 397, 405).

Although unnecessary to our determination herein, it also appears that the agreement could be held unconscionable.

An unconscionable bargain has come to be defined as one " 'such as no [person] in his [or her] senses and not under delusion would make on the one hand, and as no honest and fair [person] would accept on the other' (*Hume v United States*, 132 US 406, 411), the inequality being 'so strong and manifest as to shock the conscience and confound the judgment of any [person] of common sense' (*Mandel v Liebman*, 303 NY 88, 94)" (*Christian v Christian*, 42 NY2d 63, 71). This prenuptial agreement, which provides for no division of property at the end of the marriage, without regard for when, how or why it ends, and absolutely no right of election, is manifestly unfair (*see, e.g., Clermont v Clermont*, 198 AD2d 631, *lv dismissed* 83 NY2d 953; *see also, Tartaglia v Tartaglia*, 260 AD2d 628; *Weinstock v Weinstock*, 167 AD2d 394, *lv denied* 86 NY2d 705; *Yuda v Yuda*, 143 AD2d 657; *Bartlett v Bartlett*, 84 AD2d 800; *Stern v Stern*, 63 AD2d 700, *lv dismissed* 45 NY2d 712). No rational person would agree to this arrangement and no fair and honest person would accept it (*see, Clermont, supra*, at 633). Equity must intervene to prevent an injustice (*see, Christian, supra*, at 71). Concur—Rosenberger, J. P., Mazzarelli, Ellerin and Lerner, JJ.

Friedman, J., dissents in a Memorandum as follows: On this appeal we are asked to determine the validity of a prenuptial agreement executed in 1969 by defendant Barbara Bloomfield. The majority concludes that the agreement is void because it waives defendant's right to support, which a wife could not do under the version of General Obligations Law § 5-311 in effect in 1969, and suggests that, even if the agreement were not void, it is unconscionable as a matter of law. The majority further concludes that the Statute of Limitations was tolled during the parties' marriage, so that defendant may seek to set aside the agreement notwithstanding the 25 years that have elapsed from the time it was executed to the time this action was commenced. Because I cannot agree with these conclusions, I respectfully dissent.

Analysis of the issues presented must, of course, begin with an examination of the parties' prenuptial agreement. The agreement at issue contains a broad provision in which defendant agreed to: "WAIVE AND RENOUNCE ANY AND ALL RIGHTS that, and to which, [defendant Barbara Bloomfield] would

otherwise be entitled to because of such marriage, whether present or future right, to any and all property which [plaintiff] Marshall [Bloomfield] has now, or which he may acquire in the future, whether the same be real, personal, [or] mixed property, or of any kind or nature and wherever situated."

The majority concludes that this clause of the agreement does not mean what it plainly says, namely, that defendant is precluded from seeking any interest in plaintiff's property. Rather, it is asserted, that what the parties contemplated by this clause was a waiver of support. The majority reasons that, when the agreement was executed, a wife did not have a right to equitable distribution and did not, upon divorce, have a right to seek distribution of assets owned exclusively by her husband. Thus, it is asserted, the clause could only have been intended to act as a waiver of support, since plaintiff would have no need for an agreement to otherwise protect his property. The majority opines further that plaintiff could not have meant for the agreement to protect his property from the later enacted Equitable Distribution Law, which gives one spouse the right to share in the other's property, since, it is asserted, he would not have been prescient enough to foresee its enactment 11 years later. The majority's analysis is contrary to our decision in *Roos v Roos* (206 AD2d 293), which addressed this precise matter.

In *Roos*, the plaintiff/wife and defendant/husband entered into a prenuptial agreement in 1975. In a clause entitled "Release of Marital Rights by Wife," the agreement provided that:

"[Plaintiff/wife] hereby waives and releases all right and interest, statutory or otherwise * * * in [defendant/husband's] property, owned by him at the time of the marriage or acquired by him any time thereafter."

"During the course of the parties' divorce action in 1993, the issue arose as to whether this agreement (made five years before the Equitable Distribution Law became effective) precluded plaintiff/wife from seeking a share of defendant/husband's property under the Equitable Distribution Law. Finding that the agreement did preclude plaintiff/wife from seeking such distribution, this Court, pointing to the wording of the clause, stated (at 295): "This was but another way of expressing the parties' intention that * * * inconsistent principles relating to the division of property, such as those *later* established by the Equitable Distribution Law, were not to be applied" (emphasis added). Thus, *Roos*, interpreting an agreement legally indistinguishable from the agreement at is-

sue here, did not interpret it to mean that it waives support, but instead regarded the provision as waiving the later-adopted right to equitable distribution. What therefore emerges from *Roos* is that the majority's interpretation of the agreement as waiving support is precluded.

The majority, seeking to avoid the clear implication of *Roos*, refers to the unpublished *nisi prius* decision and asserts that the agreement in that case is distinguishable because, unlike the agreement at issue here, it contained an "express provision for an agreed upon amount of support to the wife." Our decision in *Roos*, however, in reflecting on such "[o]ther provisions," stated that they were "not relevant" to the decision (*id.* at 295). More significantly, no matter how viewed, the question in *Roos* was whether an agreement waiving all of the parties' property rights could be viewed as waiving the subsequently enacted right of equitable distribution. This, of course, is precisely the issue presented on this appeal.

In any event, even if the majority's interpretational gloss does not run afoul of our prior decision in *Roos*, its analysis is still not sustainable. In this regard, the majority declares that the agreement is void because the version of General Obligations Law § 5-311 in effect at the time it was executed prohibited a wife (although not a husband) from waiving support (*see*, L 1963, ch 576, as amended by L 1966, ch 254, § 12). In so concluding, the majority refuses to apply the current version of General Obligations Law § 5-311, enacted in 1980, which permits a wife, as well as a husband, to waive support, thereby eliminating any gender-based distinction between men and women (*see*, L 1980, ch 281, § 19). This is an approach with which I cannot agree.

In *Propp v Propp* (112 AD2d 868, *appeal dismissed* 66 NY2d 855), this Court was faced with the identical issue presented here, namely, whether the validity of a prenuptial agreement waiving support is governed by the current version of General Obligations Law § 5-311 or its predecessor. In finding that it was the current version of the law that controlled, this Court adopted the reasoning of the Appellate Division, Second Department's decision in *Goldfarb v Goldfarb* (86 AD2d 459). What *Goldfarb* explained is that the 1980 enactment of General Obligations Law § 5-311 represented a change in the public policy of this State (*id.* at 462). This being so, whether an agreement is violative of public policy must be determined by the law in effect when the agreement is construed by the court (*id.* at 462-463). Here, as the instant agreement does not violate this State's public policy as reflected in the current version of

General Obligations Law § 5-311, it is not void (*Propp v Propp, supra*; *Goldfarb v Goldfarb, supra*).

To the extent that the majority relies upon the Third Department's decision in *Slocum v Slocum* (42 AD2d 56) in support of a contrary conclusion, such reliance is misplaced. *Slocum* was decided in 1973—*seven years before* the current version of General Obligations Law § 5-311 was enacted. Accordingly, the *Slocum* court was never asked to determine whether the current version of the General Obligations Law or its predecessor should control the validity of agreements waiving support. This is because the current version of the law did not yet exist. In other words, *Slocum* merely applied the law as it existed at that time, which barred a wife from waiving support, and the majority does not explain why the later decided cases of *Propp* and *Goldfarb* are not controlling.

One further observation concerning General Obligations Law § 5-311 is required. General Obligations Law § 5-311, in its prior incarnation, was repealed in 1980 as part of an overall legislative package that sought to eliminate gender-based distinctions in, among other things, spousal support. The repeal of General Obligations Law § 5-311, and its substitution with a gender-neutral version, was prompted by a recognition that almost any gender-based distinctions in the law likely violated constitutional principles of equal protection (*see generally*, Mem of Law Rev Commn, 1980 McKinney's Session Laws of NY, at 1613-1623). In fact, prior to the repeal, the Appellate Division, Second Department declared General Obligations Law § 5-311 to be unconstitutional, noting that the statute's gender-based distinction was premised upon anachronistic views of women in our society (*Greschler v Greschler*, 71 AD2d 322, 327, *mod on other grounds* 51 NY2d 368).

With this legislative history in mind, an incongruity in the majority's holding becomes obvious. What the majority has done is declare a prenuptial agreement void because it allegedly violates a statute that was not only repealed, but was apparently repealed because it violated basic principles of equal protection and treated women as second-class citizens. It seems self-evident that such a result is not legally supportable.

A question nevertheless remains as to whether the agreement was properly executed. This issue arises because, at the same time that the current version of General Obligations Law § 5-311 was adopted, so was Domestic Relations Law § 236 (B) (3). The latter requires that agreements between spouses be acknowledged or proven in the manner required for recording a deed. The parties' 1969 agreement does not meet

that requirement. However, unlike the approach to be utilized when the question is whether the terms of the prenuptial agreement violate public policy, a determination of whether the agreement was properly executed must be made under the law as it existed at the time of execution. This follows from Domestic Relations Law § 236 (B) (3), which indicates that the formalities of execution imposed by the Domestic Relations Law shall not be deemed to affect the validity of any agreement made prior to its effective date of July 19, 1980 (*see, Elmaleh v Elmaleh,* 184 AD2d 544; *Garguilio v Garguilio,* 168 AD2d 666; *Geiser v Geiser,* 115 AD2d 373). In light of this provision, the validity of agreements made prior to that date is determined with reference to the Statute of Frauds, which merely requires that the agreement be in writing and subscribed by the party to be charged (*see, Matisoff v Dobi,* 90 NY2d 127, 134; *see also, Elmaleh v Elmaleh, supra; Garguilio v Garguilio, supra; Geiser v Geiser, supra*). As the 1969 agreement meets that test, it was properly executed.

This brings me to the majority's suggestion that the agreement is unconscionable as a matter of law. In reaching this conclusion, the majority states: "This prenuptial agreement, which provides for no division of property at the end of the marriage, without regard for when, how or why it ends, and absolutely no right of election, is manifestly unfair." I believe that this conclusion is erroneous for several reasons.

First, a prenuptial agreement is not unconscionable simply because it does not provide for distribution of a spouse's assets upon divorce. Such an agreement is statutorily authorized (*see,* Domestic Relations Law § 236 [B] [3] [2]) and I am unaware of any case that has ever required a prenuptial agreement to provide, as a condition to validity, for a distribution of assets upon divorce, and none of the cases cited by the majority so holds (*see, Tartaglia v Tartaglia,* 260 AD2d 628; *Clermont v Clermont,* 198 AD2d 631, *lv dismissed* 83 NY2d 953; *Weinstock v Weinstock,* 167 AD2d 394, *lv denied* 86 NY2d 705; *Yuda v Yuda,* 143 AD2d 657; *Bartlett v Bartlett,* 84 AD2d 800; *Stern v Stern,* 63 AD2d 700, *lv dismissed* 45 NY2d 712). In fact, none of these cases even involves prenuptial agreements.

Second, a determination of unconscionability cannot be made here as a matter of law. The majority's factual findings emanate from submissions to this Court on a motion seeking a stay of Supreme Court's order pending determination of the appeal. These submissions reflect conflicting versions of the events leading up to the execution of the agreement, resolution of which would necessitate a trial.

Third, defendant's attempt to rescind the agreement on the ground that it is unconscionable is barred by a six-year Statute of Limitations (see, CPLR 213). In this regard, any claim of unconscionability accrued upon the execution of the agreement (see, 35 Park Ave. Corp. v Campagna, 48 NY2d 813; Matter of SCM Corp. [Fisher Park Lane Co.]; 40 NY2d 788; Davis v Davis, 95 AD2d 674), which, in this case, took place 25 years before litigation commenced.*

Finally, turning to the majority's assertion that the Statute of Limitations was tolled during the parties' marriage, there is no such toll. Contrary to the majority's assertion, it has long been the law that the Statute of Limitations is not tolled merely because the parties are married, and the creation of such a toll is beyond the power of any court (see, Scheuer v Scheuer, 308 NY 447; Dunning v Dunning, 300 NY 341, 343; see also, Rosenbaum v Rosenbaum, 271 AD2d 427; Pacchiana v Pacchiana, 94 AD2d 721, appeal dismissed 60 NY2d 586; Anonymous v Anonymous, 71 AD2d 209, 212). Thus, as the agreement at issue here was executed more than 25 years before defendant sought to set it aside, she is now barred from attacking it.

Significantly, the foregoing Statute of Limitations analysis does not impact on any claim defendant has for support. As I read the record, when this litigation commenced, no one considered the prenuptial agreement to constitute a waiver of support. Plaintiff, in fact, unequivocally asserts that it is not a waiver of support by defendant. In any event, even if it is regarded as a waiver of support, Domestic Relations Law § 236 (B) (3) subjects a waiver of support to review for possible unconscionability. That review may take place "at any time prior to the entry of final judgment, even if that date is well beyond six years after the execution of agreement" (Freiman v Freiman, 178 Misc 2d 764, 767-768).

In sum, as plaintiff concedes, defendant is entitled to an award of support and nothing in the parties' agreement precludes her from receiving such an award. However, defendant is not entitled to an interest in any property owned by plaintiff since she specifically agreed otherwise, and any challenge to the agreement is barred by the Statute of Limitations. In any event, even if the Statute of Limitations were not a bar, a trial would be necessary to resolve conflicting factual averments regarding the issue of unconscionability.

---

* Even assuming that defendant could assert a basis for estopping plaintiff from asserting the Statute of Limitations, i.e., because he engaged in some sort of wrongful conduct, this, like the issue of unconscionability, could only be resolved at trial (see, Century Fed. Sav. & Loan Assn. v Net Realty Holding Trust, 87 AD2d 858).

Accordingly, I vote to reverse the order of Supreme Court and remand for further proceedings consistent herewith.

The Decision and Order of this Court entered herein on August 3, 2000 (275 AD2d 216) is hereby recalled and vacated. (*See,* 281 AD2d 325 [decided herewith].)